## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL INDICTMENT** |
| **v.** | **NO. 1:12-CR-016-RWS-GGB** |
| **PAUL L. BLACK and EDNECDIA SUTINA JOHNSON,** | |
| **Defendants.** | |

## ORDER AND FINAL REPORT AND RECOMMENDATION

Defendants Paul L. Black ("Defendant Black" or "Black") and Ednecdia Sutina Johnson ("Defendant Johnson" or "Johnson") (collectively, "Defendants") are charged with possession of counterfeit access devices and device-making equipment with intent to defraud, possession of five or more false identification documents, and possession of document-making implements, including printers and embossers to be used in the production of false identification documents, all in violation of 18 U.S.C. §§ 1029(a) and (c), and 1028(a), (b), (c), and (g).

The following motions are pending before this court: Defendants' motion to suppress (Doc. 33); Defendant Johnson's motion for leave to file out-of-time motions (Doc. 54), motion to suppress evidence (Doc. 55), and motion to suppress statements (Doc. 56); and Defendant Black's motion to suppress statements (Doc. 67), motion for

extension of time to file verification of claim and complaint of forfeiture (Doc. 72), and motion to withdraw Docket Entry 73 (Notice of Attorney Appearance) (Doc. 74).

An evidentiary hearing on the suppression issues was held before me on October 23, 2012. All transcript references ("Tr.__") are to the transcript of that hearing. My recommendations and orders on the motions follow.

## I. **INTRODUCTION**

Defendants move to suppress evidence seized pursuant to a search warrant issued by a Clayton County magistrate judge. Defendants' primary contention is that the Clayton County warrant was not valid because it was based on evidence obtained by an illegal, warrantless entry into a locked room in Defendants' home. Defendants also move to suppress statements that they made to law enforcement officers.

As discussed below, I conclude that although officers made a warrantless entry into Defendants' home and into a locked room in that home, those entries were not illegal entries. The warrantless entries were justified by exigent circumstances and by the implied consent that stemmed from the fact that Defendant Johnson called police to her home to investigate a home invasion. I also conclude that Defendants' statements should not be suppressed because the statements in issue were either made

2

while the defendant was not in custody or, in the case of Defendant Johnson, were voluntarily made after waiving <u>Miranda</u> rights.

## II.   <u>FACTS</u>

### A.   <u>Circumstances leading to warrantless search</u>

Defendant Johnson made an emergency call to the Clayton County 911 Center at 12:15 a.m. on December 21, 2011.  She told the 911 dispatcher that she needed the police to come to 9154 Betony Wood Trail because someone had kicked in her front door and a group of unidentified people had entered her house.  Johnson reported that her boyfriend was with her in the house and that his hand had been injured. Defendant Johnson also requested an ambulance. (Tr. 19; Gov't Ex. 6).  The dispatcher reported to the police that the door had been kicked in and there were several subjects inside the Betony Wood home.  (Tr. 28-29, 67; Gov't Ex. 7).

When the officers arrived at the house, they saw a person at the foot of the driveway with a bullet wound in his head.  (Tr. 68).  The officers also discovered that a second individual, later identified as Defendant Black, was in the back yard and had been shot in the hand.  (Tr. 69, 505).

The officers approached the front of the house and saw that the front doors had been kicked in.  They saw a large puddle of blood in the middle of the foyer, with a

3

shotgun and at least one spent shotgun shell lying in or near the blood. (Tr. 70-71). The officers also saw bullet holes from a pistol and blood on columns in the foyer. (Tr. 237). Officers were concerned that additional victims or suspects were still in the house. (Tr. 71, 216-17).

Because of the size and layout of the house, the officers that initially arrived on the scene decided to wait for the arrival of more officers before they entered the house. They asked for an officer to bring a long gun, such as a rifle or shotgun, for possible use as an offensive weapon. (Tr. 72-73, 215).

The officers encountered a woman, later identified as Defendant Johnson, at the house.[1]  Upon seeing Defendant Johnson, an officer took her to a patrol car for her protection and comfort[2] and for questioning about the incident. (Tr. 75, 261, 502, 514).

Additional officers arrived, including one who brought a shotgun. (Tr. 73, 491-92). Officers reasonably believed, based on the radio traffic and their observations at the house, that other individuals were still inside the house. (Tr. 71-72). Approximately

---

[1] There is a conflict in the testimony as to whether Defendant Johnson was inside or outside of the house when first seen by the officers. (Tr. 74-75, 215, 502). I find that this discrepancy is irrelevant to the issues presented in Defendant Johnson's Motion to Suppress.

[2] Johnson was wearing little clothing, it was cold, and Johnson wanted to be warm. (Tr. 261, 514).

4

eight officers entered the house in order to locate possible additional perpetrators or injured persons. (Tr. 75, 114, 162, 512). After looking in other areas of the house and seeing more blood, the officers went down to the basement. (Tr. 81-82, 108, 135).

The basement had a long hallway with various rooms off to each side. (Tr. 83-84). A trail of blood in the basement hallway led to a locked door. (Tr. 83, 171-72, 182, 217, 220, 375). The handle of the locked door was smeared with blood. Officers kicked in the locked door to look for victims or perpetrators. (Tr. 85-86, 375-76, 493). Officers initially remained in the basement room for thirty seconds to two minutes. (Tr. 162, 201, 227, 254).

While in the basement room, the officers immediately saw indications that the room was being used to commit credit card fraud. Among other things, officers saw stacks of blank credit cards and a machine that could make credit cards. Officers also saw marijuana, cell phones, a handgun, computers connected to each other, work stations, and a stack of hundred dollar bills. (Tr. 88-90, 222-23, 257, 259-60, 378, 484, 494-95).

After the initial group of officers left the basement room and confirmed that no one else was in the house, Lieutenant Stephen Palmer ("Lt. Palmer") of the Clayton County Police Department arrived at the house. (Tr. 286-87). Sergeant Clendenen

AO 72A
(Rev.8/8
2)

("Sgt. Clendenen"), who was involved in the initial search of the house, reported to Lt. Palmer that there was a fraud operation in the basement.  Sgt. Clendenen then led Lt. Palmer through the house, including the room in the basement.   While in the basement room, Lt. Palmer saw supplies indicative of a fraud operation.  (Tr. 288-90). Lt. Palmer began making plans to obtain a search warrant.  (Tr. 294-96, 298).  He left and returned to the room with Detective Erin Sawyer ("Det. Sawyer").  (Tr. 296, 326). Lt. Palmer showed the room to Det. Sawyer in order to enable Det. Sawyer to gather information for the search warrant.  (Tr. 313-14).  Det. Sawyer was in the room for about twenty minutes taking notes for the search warrant.  (Tr. 433, 453-54).  Both officers left the room at the same time.  (Tr. 315).

At a later point, but before a search warrant was issued, Detective Christopher M. Stewart ("Det. Stewart"), an officer with the crime scene section of the Clayton County Police Department, walked through the house, including the basement, to document evidence and photograph the scene.  His primary objective was to document evidence before the evidence could be disturbed or contaminated.   (Tr. 337, 339, 359). Det. Stewart did not collect any evidence until after a search warrant was obtained. (Tr. 341).

6

**B.      Circumstances of Defendant Johnson's statements**

A little after 2:10 a.m., Det. Sawyer spoke with Defendant Johnson while she sat in the patrol car outside her house.  Det. Sawyer asked Johnson about the invasion of her home.  (Tr. 446-47).  Johnson was not under arrest.  Johnson asked for, but was not given, her cell phone.  (Tr.  96).  Johnson asked to go back up to the house, but was not permitted to re-enter the residence because the police considered the house to be a crime scene.  (Tr. 163).  Other than her request to return to her house, Johnson did not ask to leave the patrol car.  It is not clear if Johnson would have been free to leave the patrol car if she had asked to do so.  (Tr. 263-65).  However, the door to the patrol car was closed, and she could not have opened it from the inside of the vehicle where she was seated.  (Tr. 448, 515-16).  During the time that Defendant Johnson was in the car, she discussed and gave a brief written statement about the home invasion.  (Tr. 60, 93,  228, 231-32, 516; Gov't Ex. 8).

Sometime  before  4:00  a.m.,  Defendant  Johnson  was  taken  to  the  police headquarters where she was interviewed by Detectives Simonds and Sawyer, with Simonds as the primary questioner.  The interview began at approximately 4:00 a.m. and lasted about three hours.  (Gov't Ex. 3; Tr. 12, 232, 434, 436, 465).  Although Defendant  Johnson  was  not  formally  arrested  until  the  end  of  the  interview,

7

the government has agreed, for purposes of the suppression hearing, that Johnson was in custody during the entire interview.  (Tr. 11).  Johnson was not given <u>Miranda</u> warnings until about two-thirds of the way through the videotaped interview at police headquarters.  (Tr.11; Gov't Ex. 9).

Before Defendant Johnson was given <u>Miranda </u>warnings, she wrote a statement describing the home invasion.  (Tr. 442; Gov't Ex. 10).  At some point before Johnson was given <u>Miranda</u> warnings, Det. Simonds told Johnson about the incriminating items and guns in the basement room and questioned her about those items.  (Gov't Ex. 3 at video counter 7:29).[3]

Throughout the interview, Defendant Johnson maintained the version of events that she described in her written statements.  She also denied any knowledge of criminal activity or guns at the house.  Det. Simonds repeatedly accused Johnson of lying, but Johnson persisted in her description of events and her denial of  knowledge of criminal activity or guns at the house.

At approximately counter number 7:30 on the video of Johnson's interview (around 6:30 a.m.), Defendant Johnson was read her <u>Miranda</u> rights.  (<u>See</u> Gov't Ex. 3 at 7:30-7:32).  Johnson acknowledged those rights and initialed each one.  (Gov't

_____

[3] Det. Sawyer testified that the time clock on the video is off by about an hour. (Tr. 434).

8

Ex. 9).  She signed the <u>Miranda</u> form on the bottom.  (<u>Id.</u>).  Johnson told the detectives that she understood her <u>Miranda</u> rights.  (Gov't Ex. 3 at 8:09).

After her waiver, Defendant Johnson persisted in her version of the circumstances surrounding the home invasion and her call to 911.  (<u>See</u> <u>id.</u> at 7:32-7:35, 7:44, 7:55-7:58).  She also continued to deny knowledge of the contents of the basement room and any guns in the house.  (<u>See</u> <u>id.</u> at 7:35-7:44, 7:49-7:52, 8:04-8:08).  She reaffirmed the written statement she had made before she waived her <u>Miranda</u> rights.  (<u>Id.</u> at 8:02).

At the conclusion of the interview, and after the detectives left the interview room, Defendant Johnson stood up, walked out of the room and asked to call a lawyer.  (Tr. 440; Gov't Ex. 3 at 8:24).  That was the first time that she asked to speak to an attorney.  (Tr. 440).  After Johnson exited the interview room, she was placed in handcuffs.  (Tr. 475).[4]

### C.      Circumstances of Defendant Black's statement

Because his hand was wounded, Defendant Black was transported by ambulance to the Atlanta Medical Center.  (Tr. 216, 410).  At approximately 3:00 a.m., Detective Kim Auge ("Det. Auge") arrived at the hospital to speak with Black.  (Tr. 410).  At that time, she was told that Black was not available.  Officer Carr learned

---

[4] Apparently, there were later statements to federal law enforcement officers that the government has agreed not to use in its case in chief.

at 5:15 a.m. that Black was waiting to go into surgery and reported that information to Det. Auge.  (Tr. 411).

About four hours later, at 9:15 a.m., Detectives Auge and Huddo went to Black's hospital room and asked him his name and date of birth.  Defendant Black told them that his name was Marcus Lively and his birth date was December 12, 1968.  (Tr. 411-12).  Then Defendant Black told the detectives that he was in too much pain to answer questions at that time.  (Tr. 412).  The detectives then left Black's hospital room.  (Id.).

Approximately one hour later, at 10:22 a.m., another officer, Sergeant Sheats ("Sgt. Sheats"), arrived at the hospital to get Defendant Black's fingerprints.  (Tr. 413).  Detectives Auge and Huddo went with Sgt. Sheats to Black's hospital room.  (Tr. 412-13).  Black refused to provide his fingerprints and asked Sgt. Sheats to leave the room, which he did.  Black agreed, however, that Detectives Auge and Huddo could stay.  (Tr. 413).

Detective Huddo again asked if the detectives could interview Defendant Black, and Black said that he could talk.  (Tr. 414).  The interview lasted approximately 15 minutes.  (Id.).  During the interview, the door to the hospital room was open.  (Id.).  Black was articulate, coherent, calm, and cooperative.  (Tr. 415).  He never asked the detectives to stop questioning him, and he was not handcuffed or restrained in any way.

10

(Tr. 415-16).  At the conclusion of the interview, the detectives  got up and left Defendant Black in his hospital room.  (Tr. 423).

**D.**     **The search warrant**

At 5:29 a.m. on December 21, 2011, a judge of the Magistrate Court of Clayton County issued a search warrant for 9154 Betony Wood Trail based on the affidavit of Detective Ken MacGillivary ("Det. MacGillivary").  (Gov't Ex. 4B).

The affidavit described the 911 call and the gunshot victims at the scene.  The affidavit contained the following description of the evidence in the basement room:

> Upon further checking of the residence [the officers] observed multiple blank financial transaction cards, blank checks, a printing press, multiple computers, printers, scanners, cameras and cell phones which were determined to have been utilized in the manufacturing of fraudulent checks and financial transaction cards.  There were also multiple handguns observed in the residence.

(Id. at 4, MacGillivary Aff.).

The warrant listed the items to be seized as:

> Multiple unknown handguns rifles, shotguns and their components to include ammunition.  Blood, hair and fibers to be utilized in further forensic processing.  Any and all electronic devices to include, but not limited to cell phones, cameras, computers, credit card machines, printers, scanners, and inked printing press utilized in the ongoing enterprise of the manufacturing of fraudulent checks and financial transaction cards.  Any documentation related to lists of

11

> customers involved [in] the illegal and fraudulent manufacturing of checks and financial transaction cards, to also include any ledgers.   Any copies of home video surveillance.  Any and all safes to specifically include an 18 inch by 18 inch Sentry Safe combination keypad safe,
>
> Which are in violation of Georgia Law(s):
>
> Armerd (sic) Robbery, OCGA: 16-08-41
> Aggravated Assault, OCGA: 16-05-21
> Aggravated Battery, OCGA: 16-05-24
> Burglary, OCGA: 16-07-01

(Id. at 1, Search Warrant).

After the warrant was issued, officers went back to the house and searched for and seized items from the basement room.  Additional facts are discussed in context below.

## III.   DISCUSSION

### A.   The police did not violate Defendants' Fourth Amendment rights when they searched Defendants' home.

Defendants concede that the officers legally entered Defendants' house for  the purpose of investigating the crime that Johnson reported in her 911 call.  (Doc. 101 at 8).  However, Defendants contend that the officers violated their Fourth Amendment rights when they conducted an extensive warrantless search of Defendants' residence. (Doc. 107 at 2).

AO 72A
(Rev.8/8
2)

The well-known general rule is that a search of a private home without consent is unreasonable under the Fourth Amendment unless it has been authorized by a valid search warrant.  See Michigan v. Tyler, 436 U.S. 499, 506 (1978); Camara v. Municipal Court of the City & County of San Francisco, 387 U.S. 523, 528-29 (1967).  There is a presumption that a warrantless search of private property is per se unreasonable unless the search falls within one of the clearly delineated exceptions to the warrant requirement.  Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971).

An exception to the warrant requirement exists when there are exigent circumstances.  The police may enter a private premises and conduct a search if "exigent circumstances" mandate immediate action.  See United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002) (citing Michigan v. Tyler, 436 U.S. 499, 509, 98 S. Ct. 1942, 1949-50 (1978)).  "[E]mergency situations involving endangerment to life fall squarely within the exigent circumstances exception."  Id. at 1337.

Here, Johnson summoned the police to her residence by making an emergency 911 call.  She reported to the 911 operator that a "group of people" had broken into her house, and she did not know if they were still there.  She stated that her boyfriend had been injured and needed an ambulance.  She said that she could still hear people yelling. (Gov't Ex. 6).

13

When the police arrived, and before they searched the house, they found a suspect with a gunshot wound to his head and Defendant Black with a gunshot wound to his hand.  In addition, through the open front door, the officers saw a pool of blood, a shotgun lying in the blood, and bullet holes in the walls from a handgun.

Although the police had been told that there were multiple home invaders, only one had been located.  Also, the police did not know how many people lived in the home.  The officers knew that at least one gun was missing because they recognized that both a shotgun and handgun had been discharged, but they had located only the shotgun.  The observations of the police, together with Defendant Johnson's statements that there had been a group of perpetrators, clearly created exigent circumstances that warranted a thorough search of the house for additional persons.[5]

As the police proceeded through the house, the need for a thorough search became even more apparent.  The police found more blood in the master bedroom and a trail of blood leading to a locked door in the basement.  That door had blood on the door handle.  Under these circumstances, the police would have been remiss in their

---

[5] Defendants cite pages 69-71 of the transcript to support the statement that "Black and Johnson ... advised the officers there was no one else inside the residence." (Doc. 101 at 4).  I do not see anything on those pages that supports that statement. In fact, on page 71 of the transcript, Det. Harris testified that he heard over the radio that several individuals were inside.

AO 72A
(Rev.8/8
2)

duties if they had left the home without ensuring that no possible suspects or victims remained in any part of the house and that any accessible weapons had been removed from the premises.  See United States v. Yanez, 490 F. Supp. 2d 765, 771 (S.D. Tex. 2007).  I strongly disagree with Defendants' contention that there were no exigent circumstances that necessitated a search of the house.

The decision in Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967), supports the government's position in this case.  Hayden is usually cited in support of the "hot pursuit" exception to the warrant requirement which allows police to enter a residence when they are in hot pursuit of a fleeing suspect.  See, e.g., United States v. Blasco, 702 F.2d 1315, 1325 (11th Cir. 1983).  The instant case does not involve hot pursuit of a fleeing suspect.  However, Hayden also holds that once the police have made a warrantless entry into a home based on exigency, they may lawfully search for a suspect and those areas where weapons and persons may be hidden.  Hayden, 387 U.S. at 299.

In Hayden, police officers entered a home into which an armed robbery suspect had fled.  Id. at 297-98.  The officers searched for the suspect and any weapons that might harm them or the public.  Id.  The officers discovered two guns, other physical evidence, and the suspect pretending to be asleep in an upstairs bedroom.  Id. at 298.

AO 72A
(Rev.8/8
2)

The <u>Hayden</u> Court held that the warrantless searches and seizures were lawful under the circumstances presented. The Court expressly permitted the scope of a search to be "as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape." <u>Id.</u> at 299. The search may be for a suspect and any items the suspect may use against the officers. <u>Id.</u>

In this case, I find that the police justifiably conducted a warrantless search of Defendants' residence for persons and weapons. They did not unnecessarily prolong that search. In the course of that search, the police came across evidence of fraud in the basement room that incriminated the Defendants. The officers' unanticipated find of incriminating evidence in the basement does not require suppression of the evidence in that room. <u>See</u> <u>Hayden</u>, 387 U.S. at 300-01 (holding that incriminating items found in the course of search for suspects and weapons were lawfully seized); <u>Holloway</u>, 290 F.3d at 1340-41. <u>See also</u> <u>Horton v. California</u>, 496 U.S. 128, 136-37 (1990) (determining that it is not a violation of the Fourth Amendment to seize objects that are in plain view of the officer, so long as he is lawfully in the place where the evidence is viewed and its illegal or incriminating nature is immediately apparent).

Although it is not necessary to the conclusion in this case, I also find that Defendant Johnson gave implied consent for officers to enter and search her home when

16

she called 911 to summon police to her house to investigate an ongoing home invasion. See State v. Flippo, 575 S.E.2d 170, 183 (W. Va. 2002) (surveying case law on this issue and holding that when a person summons the police to her home and states that a crime was committed against her by a third person at the home, she implicitly consents to a search of the premises reasonably related to the routine investigation of the offense and the identification of the perpetrator).

Defendants' reliance on United States v. McGough, 412 F.3d 1232 (11th Cir. 2005) is misplaced. In McGough, the defendant was arrested outside his apartment after police found that he had locked his five-year-old daughter alone in his apartment while he left to pick up a pizza. Id. at 1233-34. After the defendant had been arrested and his daughter was safely outside the apartment, the police entered the apartment for the first time without a warrant in order to get shoes for the daughter. Id. at 1234. Upon entering, they found marijuana and a gun. The government argued that the police officers' community caretaking function justified their warrantless entry into McGough's apartment. Id. at 1236, 1238. The court disagreed, holding that even if there was a community caretaking exception to the warrant requirement, the facts did not justify its application because there was no immediate threat or exigent circumstances. Id. at 1239. By contrast, in the present case, as discussed above, there

17

was an immediate threat and exigent circumstances that necessitated a warrantless search.

### B.   Subsequent entries into the basement did not invalidate the search warrant.

Defendants also argue that even if the initial entry into the basement room was lawful, the evidence seized under the warrant should be suppressed because the subsequent entries of officers after the house had been cleared were not lawful. As discussed above, after the officers had completed their search and discovered the incriminating evidence in the basement room, additional officers entered the room to document the contents, in part for obtaining a search warrant.

Even if these subsequent entries were unlawful, the search pursuant to the search warrant should be upheld because the officers' observations obtained from their initial lawful entry into the basement room provided probable cause for the warrant to issue. Under the "independent source" doctrine, the challenged evidence is admissible if it was obtained from a lawful source, independent of the illegal conduct, provided that the law enforcement officer's decision to seek the warrant was not prompted by the information gained during the illegal search.  United States v. Chaves, 169 F.3d 687, 692-93 (11th Cir. 1999); see also Segura v. United States, 468 U.S. 796, 805 (1984) (explaining that the exclusionary rule is not implicated when the officers learned of the challenged

AO 72A
(Rev.8/8
2)

evidence from an independent source).  The rationale for the independent source doctrine is that the police should be put "in the same, not a worse, position tha[n] they would have been in if no ... error or misconduct had occurred."  Murray v. United States, 487 U.S. 533, 537 (1988) (quoting Nix v. Williams, 467 U.S. 431, 443 (1984)); United States v. Jones, 433 F. App'x. 825, 828 (11th Cir. 2011); United States v. Hill, 338 F. App'x 855, 857-58 (11th Cir. 2009); United States v. Glinton, 154 F.3d 1245, 1254-55 (11th Cir. 1998).

In Hill, firefighters and police had originally entered the defendant's home legally in response to an emergency.  Hill, 338 F. App'x at 858.  They left, but subsequently re-entered the home and exceeded the scope of their initial search.  The court held that even if the officers' subsequent entries into the home were illegal because there were no exigent circumstances and they exceeded the scope of the initial entry, the search pursuant to the later-issued warrant would be upheld.  The court found that the affidavit was based on the observations of firefighters who, while lawfully in Hill's residence, had observed the incriminating evidence in plain view, and the warrant was not sought because of what was seen during any unauthorized entry.  Id.

Similarly, in the present case, the affidavit was based on the observations of law enforcement officers who had observed incriminating evidence in plain view while

lawfully investigating an emergency at Defendants' residence. The government concedes that the affidavit included a reference to scanners, checks, and cameras, and that the officers who initially entered the basement room did not specifically testify to seeing those items. (Doc. 106 at 30). However, the affidavit also referred to multiple blank financial transaction cards , a printing press, multiple computers, cell phones and guns in the basement room, all of which were seen by officers during their initial entry into the room. The officers immediately recognized that the items in the room were being used to commit fraud.

Disregarding the portions of the affidavit that described items that arguably were seen only after the initial entry, there was still ample probable cause of a credit card fraud operation in the basement room. Thus, the warrant provided a lawful basis to conduct a search. See United States v. Kapordelis, 569 F.3d 1291, 1309, 1311-12 (11th Cir. 2009) ("the trial court is to disregard those portions of the affidavit which the defendant has shown are arguably false or misleading ... [and l]ooking only at the remaining portions of the affidavit, the court will then determine whether including the omitted facts would have prevented a finding of probable cause."). After conducting this analysis, I conclude that the search warrant was based on sufficient lawfully-obtained evidence to provide probable cause.

20

**C.**   **Defendants' allegations of other defects in the search warrant are without merit.**

Defendants argue that the search warrant was not valid because the affiant omitted certain facts.  Specifically, Defendants allege that the warrant application omitted:  (1) that Black was a resident in the home and a victim of the home invasion; (2) that Black told officers that no one else was inside the residence; (3) that the "protective sweep" of the residence occurred fifteen minutes after officers arrived on the scene and was not supported by reasonable suspicion or articulable facts;  (4) that at the time of the protective sweep, any emergency had ended and there was no indication that others were present on the scene; and (5) that the officers observed the evidence listed in the affidavit only after they broke into the locked door in the basement.  (Doc. 101 at 31-32).

These arguments are without merit.  As an initial matter, the affidavit states that the responding officers cleared the residence to look for victims and any other offenders.  However, it was not necessary for the affiant to provide other details that relate to the constitutionality of the subsequent entries into the house or Black's status as a victim.  Those facts would only be relevant in the after-the-fact judicial review on a motion to suppress such as the one now being conducted.  The job of the issuing magistrate was to determine whether there was probable cause for the issuance of the

21

warrant, not to rule on the constitutionality of the prior entry.  <u>See</u> Rule 41(d) of the Federal Rules of Criminal Procedure.  The facts that were allegedly omitted from the affidavit would not have caused the magistrate judge to find that there was no probable cause.

### D.      Det. Stewart's photographs should be suppressed.

As set forth above, after the house had been cleared and before the search warrant was obtained, Det. Stewart entered the house, conducted a thorough search for evidence, and took photographs, including photographs in the basement room.  At the time he did so, Det. Stewart knew that a search warrant was going to be obtained.  (Tr. 348, 354-58).  I must now address whether Det. Stewart's photographs of the basement room should be suppressed.

The government apparently concedes that there were no exigent circumstances at the time of Det. Stewart's entry into the house.  (Doc. 106 at 22-23).  The government relies on <u>United States v. Brand</u>, 556 F.2d 1312 (5th Cir. 1977)[6] to argue that Det. Stewart's entry into the house after the exigency had ended was lawful.  (Doc. 106 at 23-24).  In <u>Brand</u>, police had initially legally entered a defendant's home because of

---

[6]  Decisions of the Fifth Circuit Court of Appeals rendered prior to October 1, 1981 are binding precedent in the Eleventh Circuit.  <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981).

AO 72A
(Rev.8/8
2)

a medical emergency.  The court ruled that a police officer who joined his colleagues in the home after the medical emergency had ended had not violated the defendant's Fourth Amendment rights.  <u>Brand</u>, 556 F.2d at 1317-18.  The court reasoned that the defendant had already lost his expectation of privacy because of the previous entry.  <u>Id.</u> However, the court added in a footnote that "[o]f course, the later officials must confine their intrusion to the scope of the original invasion unless a warrant or one of the exceptions to the warrant requirement justifies a more thorough or wide ranging search."  <u>Id.</u> at 1317 n.9.  Here, because Det. Stewart conducted a more thorough search and took photographs, his intrusion was not limited to the scope of the original entry.  <u>See</u> <u>United States v. Parr</u>, 716 F.2d 796, 813, 816 (11th Cir. 1983) (applying <u>Brand</u> to hold that a search for valuables in a fire-damaged house falls outside the immediate exigency created by the fire and must be supported by a warrant).

The government also argues alternatively that the inevitable discovery doctrine should be applied to preclude the suppression of the photographs.  (Doc. 106 at 24 n.9). The inevitable discovery exception to the exclusionary rule applies if the prosecution can establish that the challenged evidence "ultimately or inevitably would have been discovered by lawful means."  <u>Nix v. Williams</u>, 467 U.S. 431, 444 (1984).

23

The Eleventh Circuit applies a two-part standard to determine whether a showing of inevitable discovery has been made. To qualify for admissibility, there must be (1) a reasonable probability that the evidence would have been discovered by lawful means, and (2) the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct. United States v. Satterfield, 743 F.2d 827, 846 (1984) (citing United States v. Brookins, 614 F.2d 1037 (5th Cir. 1980)).

Here, the inevitable discovery doctrine does not apply because the challenged evidence -- the photographs -- did not exist prior to Det. Stewart's entry, and therefore could not have been inevitably discovered.

### E.     Defendant Johnson's statements are admissible.

#### 1.     Defendant Johnson was not in custody while she was in the patrol car.

Defendant Johnson contends that her statements made in response to questioning while she sat in a patrol car should be suppressed because she was in custody while in the patrol car and had not been given Miranda warnings.

The well-known general rule is that a person who is arrested and detained must be given Miranda warnings in order for the person's statements made in response to interrogation by a law enforcement officer to be used against her in court. Miranda v.

24

Arizona, 384 U.S. 436 (1966).  Miranda requires, among other things, that an arrestee be advised before questioning that he or she has the right to remain silent and the right to an attorney.  Id. at 444-45.  Miranda warnings are required only when a defendant is interrogated while in custody.  See Stansbury v. California, 511 U.S. 318, 320-22 (1994).

To determine whether a suspect is in custody, the court must examine the objective circumstances from the perspective of a reasonable person in the defendant's position.  Berkemer v. McCarty, 468 U.S. 420, 442 (1984).  "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person."  United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) (citation omitted).  While courts consider the totality of the circumstances, "the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest."  Stansbury, 511 U.S. at 322 (internal marks and citation omitted).

Here, Defendant Johnson had contacted the police and summoned them to her home to investigate a violent home invasion reportedly in progress.  A reasonable person in Defendant Johnson's position would not have believed that she was in custody.  Johnson was not handcuffed, none of the officers had drawn their weapons,

25

she was not accused of a crime, and she was never told that she could not leave. Defendant Johnson was placed in a patrol car for her own safety and comfort. It was cold outside and Johnson was wearing little clothing. (Tr. 261, 514). It was to be expected that the police would want to question her about the circumstances of the home invasion that she had reported. It was also reasonable that the police would not allow Johnson to return to the home which was still being considered the scene of a home invasion. Under the totality of the circumstances, I find that there was no restraint on Johnson's freedom of movement of the degree associated with formal arrest even if she was not free to leave the patrol car. Therefore, the statements that Johnson made in the patrol car should not be suppressed.

> **2.    Defendant Johnson waived her *Miranda* rights and voluntarily made statements after her waiver.**

The government has agreed for purposes of this motion that Defendant Johnson was in custody while in the police headquarters, and that her statements prior to the time she was given Miranda warnings will not be used in the government's case in chief. Therefore, the question for my consideration is whether Johnson's post-Miranda statements are admissible.

26

The government established that Defendant Johnson was advised of her <u>Miranda</u> rights. The court must also determine whether Johnson voluntarily, knowingly and intelligently waived those rights.  This inquiry is twofold:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

<u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (internal quotation marks and citations omitted).  A signed <u>Miranda</u> waiver form is strong proof of a waiver, but it is not conclusive.  <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979).  I have conducted the required inquiry and conclude that  Johnson voluntarily, knowingly and intelligently waived her <u>Miranda</u> rights.

The  admissibility  of  Johnson's  post-<u>Miranda</u>  statements  in  response  to questioning by the detectives also depends on the application of <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985).  In <u>Elstad</u>, the Court held that an initial failure of the police to administer <u>Miranda</u> warnings to a suspect does not require suppression of that suspect's

27

subsequent statements given after <u>Miranda</u> warnings and a waiver of rights.  The Court

explained:

> It is an unwarranted extension of <u>Miranda</u> to hold that a
> simple failure to administer the warnings, unaccompanied by
> any actual coercion or other circumstances calculated to
> undermine the suspect's ability to exercise his free will, so
> taints the investigatory process that a subsequent voluntary
> and informed waiver is ineffective for some indeterminate
> period.

<u>Id.</u> at 309.  "A subsequent administration of <u>Miranda</u> warnings to a suspect who has

given a voluntary but unwarned statement ordinarily should suffice to remove the

conditions that precluded admission of the earlier statement."  <u>Id.</u> at 314.

Defendant Johnson relies upon <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), which

narrowed the application of <u>Elstad</u>.  <u>Seibert</u> establishes that suppression of a warned

confession is required when a two-step interrogation technique is used by law

enforcement in a calculated way to undermine the <u>Miranda</u> warnings.  <u>See</u> <u>United States</u>

<u>v. Street</u>, 472 F.3d 1298, 1313-14 (11th Cir. 2006) (citing <u>Seibert</u>, 542 U.S. at 622).

In determining whether the law enforcement officers employed such a tactic, the court

must consider the totality of circumstances which includes: "the timing, setting and

completeness of the prewarning interrogation, the continuity of police personnel and the

28

AO 72A
(Rev.8/8
2)

overlapping content of the pre- and post-warning statements." Id. at 1314 (citation omitted).

Here, there is no indication that the police used a two-step interrogation tactic in order to undermine the Miranda warnings.  Such a tactic occurs when police purposefully withhold Miranda warnings in order to obtain a full confession, and then provide the suspect with full warnings and get her to re-confess after the warnings. Street, 472 F.3d at 1313.  Here, there was never a confession.  Defendant Johnson repeatedly insisted throughout her interview that she had no knowledge of any criminal activity in her home and had done nothing wrong.  Therefore, there was no advantage for the police to wait until a certain point in her interview before giving her Miranda warnings.  Accordingly, Seibert is not applicable, and the general rule of Elstad applies.

### F.    Defendant Black's statements are admissible.

Defendant Black argues that his statements made while he was in the hospital are not admissible because he was in custody and not given Miranda warnings.

Black was taken to the hospital to receive care for the shotgun wound to his hand. While at the hospital, he underwent surgery.  After that surgery, detectives attempted to interview him, but Black asked that they leave because he could not answer questions at that time.  They left as requested.

29

About an hour later, three officers returned to Defendant Black's hospital room, one trying to fingerprint Black, and the other two seeking to interview him. Black sent away the officer who wanted to fingerprint him, but allowed the other two officers (detectives) to remain and interview him. Black was never handcuffed or restrained. No one ever told Black that he was under arrest. The door to his room was open throughout the interview. The two detectives left Black alone in his room at the conclusion of the interview.

In light of the foregoing facts, I conclude that Defendant Black was not in custody during his interview at the hospital. See United States v. Robertson, 19 F.3d 1318, 1320-21 (10th Cir. 1994) (finding that the defendant was not in custody even though he was interviewed by law enforcement regarding a bank robbery while he was hospitalized for a head injury in a car accident); United States v. Martin, 781 F.2d 671, 673 (9th Cir. 1985) (finding that questioning was noncustodial despite the fact that defendant was injured in an explosion, had received several days of treatment and was unable to leave the hospital, because there was no evidence law enforcement caused or prolonged his stay in the hospital). Courts must "differentiat[e] between police-imposed restraint and circumstantial restraint ...." United States v. Jamison, 509 F.3d 623, 629, 633 (4th Cir. 2007) (finding that defendant was not in custody even though he was

30

suffering from a gunshot wound and was lying on a gurney with an I.V. line inserted into his arm, and was unable to get up and walk away from the officers who were questioning him).  Because Defendant Black was not in custody, there was no need to advise him of his rights under <u>Miranda</u>.

## IV.   <u>CONCLUSION</u>

For the reasons stated, I **RECOMMEND** that Defendants' Motion to Suppress (Doc. 33) be **GRANTED IN PART AND DENIED IN PART**; that Defendant Johnson's motion to suppress evidence and motion to suppress statements (Docs. 55 and 56) be **GRANTED IN PART AND DENIED IN PART**; that the photographs taken by Det. Stewart be suppressed, but that no other evidence or statements be suppressed; and that Defendant Black's motion to suppress statements (Doc. 67) be **DENIED**.

I **HEREBY GRANT** Defendant Johnson's motion for leave to file out-of-time motions (Doc. 54) *nunc pro tunc* to July 12, 2012.  I **DENY** Defendant Black's motion to file verification and answer to complaint until after the evidentiary hearing (Doc. 72) (because it apparently relates to a civil forfeiture case not assigned to me), and **GRANT** his motion to withdraw Docket Entry 73 (Notice of Attorney Appearance) (Doc. 74).

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial.  It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

AO 72A
(Rev.8/8
2)

It is so **ORDERED** and **RECOMMENDED**, this 12th day of June, 2013.

GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)